08-5348-cv
EEOC v. UPS

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

————————

August Term, 2009

(Argued: August 24, 2009            Decided: November 19, 2009)

Docket No. 08-5348-cv

————————

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

*Plaintiff-Appellant*,

—v.—

UNITED PARCEL SERVICE, INC.,

*Defendant-Appellee*.

————————

B e f o r e :

NEWMAN AND KATZMANN, *Circuit Judges*, and TRAGER, *District Judge*.[*]
————————

Appeal from an order of the United States District Court for the Western District of New York (William M. Skretny, *Judge*), entered September 3, 2008, denying the Equal Employment Opportunity Commission's ("EEOC") application to enforce a subpoena. We hold that the district court, in finding that national information was not relevant to the charges being investigated by the EEOC, applied too restrictive a standard of relevance. We therefore reverse.

Judge Newman concurs, and also files a separate concurring opinion.

_____

[*] The Honorable David G. Trager of the United States District Court for the Eastern District of New York, sitting by designation.

JULIE L. GANTZ, Attorney (James L. Lee, Deputy General Counsel, Vincent Blackwood, Acting Associate General Counsel, *of counsel*), Equal Employment Opportunity Commission, Washington, D.C., *for Plaintiff-Appellant.*

WENDY JOHNSON LARIO, Day Pitney LLP, Morristown, N.J., *for Defendant-Appellee.*

PER CURIAM:

This case calls upon us to review a district court's refusal to enforce an administrative subpoena filed by the Equal Employment Opportunity Commission ("EEOC"). The EEOC requested information about how religious exemptions to United Parcel Service, Inc.'s ("UPS") Uniform and Personal Appearance Guidelines ("Appearance Guidelines"), which apply to every UPS facility across the country, are handled nationwide. The district court concluded that this nationwide information was not relevant to the two individual charges being investigated by the EEOC. We hold that the district court applied too restrictive a standard of relevance and we therefore reverse its order.

## BACKGROUND

UPS's Appearance Guidelines prohibit employees in public-contact positions[1] at all UPS facilities from wearing any facial hair below the lower lip. Until 1999, employees who refused to comply with the Appearance Guidelines for religious reasons were not placed in public-contact positions. In 1999, UPS formalized a religious accommodation policy to allow for the granting of limited exemptions from the Appearance Guidelines for religious beliefs. A memo dated

---

[1] Public-contact positions require the employee to meet the public while on the job.

October 15, 1999 established a process by which requests for exemption from the Appearance Guidelines for religious reasons should be evaluated, so that UPS could "ensure that all future requests for exemption . . . will be handled in a consistent manner." J.A. 243. Pursuant to the process, an employee seeking such an exemption can submit a request to his or her immediate supervisor and manager, who then forwards the request to the district Human Resources manager.

> The district Human Resources manager will communicate with his or her district manager, district Labor Relations manager, and region H.R. manager, that a request for exemption has been received. . . . Region Human Resources will contact Corporate Workforce Planning, who will coordinate with all necessary corporate groups--Legal, Labor Relations, Procurement, etc.--to obtain a consistent answer. . . . The resolution will flow back to the district in reverse order of the initial request, namely, from Corporate through the region Human Resources manager to the district H.R. manager.

*Id.* This process was updated on January 15, 2002 to provide that Region Human Resources would only contact Corporate Workforce Planning "if necessary." J.A. 221. Despite these memoranda, according to UPS's Corporate Workforce Planning Manager Craig Owen, in practice, requests for accommodation are reviewed and decisions made, "on a case-by-case basis by the human resources staff at the UPS facility where the request is made." J.A. 215.

On November 23, 2005, Bilal Abdullah, a practicing Muslim who wears a beard, interviewed with UPS's Rochester, New York facility for the position of seasonal driver's helper and sorter. When told by the interviewer that he would have to shave his beard, he explained that maintaining a beard was part of his religion. According to the UPS interviewer, she responded that other seasonal positions were available that would not require Abdullah to shave his beard. On November 28, 2005, Abdullah attended an orientation, where he was asked to fill out a form that stated he would be clean shaven. He again stated that he could not shave his beard because

3

of his religion. He was then logged out of UPS's computer system and was not hired. According to UPS, Abdullah was not hired because, on November 25, 2005, UPS learned that he had provided a false social security number with his application, thereby rendering him ineligible for employment.

Abdullah filed a charge with the EEOC's Buffalo office on January 19, 2006, alleging religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").

Muhammed Farhan, also a Muslim, began working at UPS in Dallas, Texas as a package handler in 2001. The position did not require any contact with the public. In January 2007, UPS accepted his bid for a full-time driver position. In or about February 2007, Farhan started to become more religious and began to grow a beard. In April 2007, he was told to report for a full-time driver position. When he did so, he was told that UPS does not allow anyone with a beard to be a driver. Farhan spoke with his manager and union representative and asked for a religious accommodation to allow him to drive a UPS truck. The manager said that Farhan could not drive for UPS if he had a beard, and would have to return to his position as package handler (which is not a public-contact position). Later that week, Farhan went to the local human resources office and asked for a form to request a religious accommodation. Both human resources officers to whom he spoke said they knew of no such form. Two days later, he went to the UPS hub in Mesquite, Texas, to ask for a religious accommodation. The human resources officer there also did not know about any form to request an accommodation.

Farhan filed a charge with the Texas Workforce Commission and the EEOC on April 26, 2007, alleging that he had been prevented from working as a driver because of his beard, as UPS refused to accommodate his religious practice. Moreover, Farhan alleged: "I also believe that

4

Respondent has a pattern or a practice of refusing to accommodate the religious observances, practices and beliefs of its employees." J.A. 24. In June 2007, the UPS District Manager for Human Resources contacted Farhan and told him that he could come fill out a form to request a religious accommodation for the full-time driver position. Farhan did so, and the request was granted later that month.

In the course of its investigation of Abdullah's charge, the EEOC's Buffalo office sent UPS a request for information seeking, *inter alia*: (1) all documents related to the Appearance Guidelines and a list of all jobs which are subject to the Guidelines; (2) identifying information for all job applicants denied employment because of their refusal to adhere to the Appearance Guidelines since January 1, 2004; (3) identifying information for all employees who requested a religious accommodation to the Appearance Guidelines and the outcomes of those requests since January 1, 2004; and (4) identifying information for all employees who were terminated for reasons relating to the Appearance Guidelines since January 1, 2004. UPS objected to the request, explaining that it did not have the information sought in any centralized location and did not keep records on job applicants who requested religious accommodation to the Appearance Guidelines.

On November 20, 2007, the EEOC filed a petition in the United States District Court for the Western District of New York to enforce the subpoena. By order dated September 2, 2008, the district court denied the petition, holding that the subpoena was overly broad and sought national information not relevant to the individual charges being investigated. This appeal followed. After oral argument, held on August 24, 2009, we directed the parties to attempt to reach a mutually agreeable resolution of this case. We were informed by letter dated October 16,

5

2009 that those discussions failed.  Hence, we issue this opinion.

## DISCUSSION

Under Title VII, the EEOC is required to investigate charges of discrimination to determine whether there is reasonable cause to believe that an employer is engaged in an unlawful employment practice, *see* 42 U.S.C. § 2000e-5(b), and may issue subpoenas in connection with its investigation, *id.* § 2000e-9.  It is entitled to "any evidence of any person being investigated . . . that relates to unlawful employment practices covered by [Title VII] and is relevant to the charge under investigation." *id.* § 2000e-8(a).

As we recently clarified, the district court's "role in a proceeding to enforce an administrative subpoena is extremely limited." *Am. Med. Response*, 438 F.3d at 192 (internal quotation marks omitted).  To obtain enforcement of an administrative subpoena, "[a]n agency must show only [1] that the investigation will be conducted pursuant to a legitimate purpose, [2] that the inquiry may be relevant to the purpose, [3] that the information sought is not already within [the agency's] possession, and [4] that the administrative steps required . . . have been followed." *Id.* (internal quotation marks omitted).  A subpoena that satisfies these criteria will be enforced unless the party opposing enforcement demonstrates that the subpoena is unreasonable or that compliance would be "unnecessarily burdensome." *Id.* at 193 (internal quotation marks omitted) (emphasis omitted).

As the Supreme Court has explained:

[T]he [EEOC] is entitled to access only to evidence "relevant" to the charge under investigation. That limitation on the Commission's investigative authority is not especially constraining.  Since the enactment of Title VII, courts have generously construed the term "relevant" and have afforded the Commission access to virtually any material that might cast light on the allegations against the employer . . . [Moreover], it is crucial that the Commission's ability to investigate charges of systemic discrimination not

6

be impaired.

*EEOC v. Shell Oil Co.*, 466 U.S. 54, 68-69 (1984).

With these standards in mind, we hold that the district court applied too restrictive a standard of relevance in determining that information about how religious exemptions to the UPS Appearance Guidelines are (or are not) granted nationwide was not relevant to the charges being investigated. The following facts and factors are relevant to our decision. First, the Appearance Guidelines apply to every UPS facility in the country. *Cf. Joslin Dry Goods. Co. v. EEOC*, 483 F.2d 178, 184 (10th Cir. 1973) (where complainant alleged that she was subjected to a racially motivated discharge at defendant's Downtown Denver store, affirming district court's refusal to enforce subpoena beyond that store because each store operated as a separate employment unit and there were no hiring or firing practices or procedures that applied to all stores).

Second, until 1999, UPS did not allow employees who, for religious reasons, could not meet the Appearance Guidelines to work in public-contact positions. A memo issued in October 1999 established a process by which requests for exemption should be evaluated, so that UPS could "ensure that all future requests for exemption . . . will be handled in a consistent manner." J.A. 243. The initial process involved forwarding the request up to Corporate Workforce Planning.[1] Third, Abdullah and Farhan were both told that they could not drive a UPS truck while wearing a beard. Neither was told he could request an exemption from the policy for religious reasons, and when Farhan specifically requested a form to apply for a religious accommodation, he was told by two different UPS offices that none existed. Finally, Farhan's

---

[1] As discussed above, this process was updated on January 15, 2002 to provide that Region Human Resources would only contact Corporate Workforce Planning "if necessary." J.A. 221.

EEOC charge alleges not only one specific case of failure to accommodate, but a pattern or practice of religious discrimination in failing to accommodate those who cannot meet the UPS Appearance Guidelines for religious reasons.

UPS's arguments as to why the subpoena should not be enforced are without merit, and only one warrants any discussion here. UPS argues that the two charges fail to justify nationwide discovery as Abdullah was not hired because he gave an incorrect Social Security number and Farhan actually was accommodated. However, UPS's arguments as to the merits do not prevent the EEOC from investigating these charges. Indeed, at the investigatory stage, the EEOC is not required to show that there is probable cause to believe that discrimination occurred or to produce evidence to establish a *prima facie* case of discrimination. *See Shell Oil*, 466 U.S. at 72 (the EEOC "may insist that the employer disgorge any evidence relevant to the allegations of discrimination contained in the charge, regardless of the strength of the evidentiary foundation for those allegations").

## CONCLUSION

The district court's determination that information about how religious exemptions to the UPS Appearance Guidelines are handled nationwide was not relevant to the charges being investigated by the EEOC in this case was clearly erroneous. Therefore, the order of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

JON O. NEWMAN, Circuit Judge, concurring:

I concur in the Court's opinion and write separately to consider the standard of review applicable to appellate consideration of a district court's determination of the relevance of information sought by an administrative subpoena.

Preliminarily I note that with respect to review of the ultimate decision of a district court whether to enforce an administrative subpoena, it is generally said that the standard for appellate review is abuse of discretion. See, e.g., Ratliff v. Davis Polk & Wardwell, 354 F.3d 165, 168 (2d Cir. 2003); FTC v. GlaxoSmithKline, 294 F.3d 141, 146 (D.C. Cir. 2002); FDIC v. Wentz, 55 F.3d 905, 908 (3d Cir. 1995); NLRB v. California Food Processors, 81 F.3d 507, 510 (4th Cir. 1996) (quoting NLRB v. G.H.R. Energy Corp., 707 F.2d 110, 113 (5th Cir. 1982)). A Sixth Circuit opinion has said that the appellate task is "to weigh the likely relevance of the requested material to the investigation against the burden to Ford of producing the material." EEOC v. Ford Motor Credit Corp., 26 F.3d 44, 47 (6th Cir. 1994). However, the Ninth Circuit has stated that it reviews a district court's order to enforce an EEOC administrative subpoena de novo, see EEOC v. Federal Express Corp., 558 F.3d 842, 846 (9th Cir. 2009).

With respect to review of a district Court's determination of

whether the information sought by an administrative subpoena is relevant, the case law has developed in different and not entirely satisfactory ways. One line of cases says that a district court's determination of relevance is a finding of fact reviewed for clear error. The notion that relevance in this context is "factual" crept into the case law without much thought. The first assertion of that "fact" proposition that I have found is in footnote 14 in FTC v. Lonning, 539 F.2d 202, 208 n. 14 (D.C. Cir. 1976). No authority was cited. The D.C. Circuit then promoted the proposition into text in FTC v. Anderson, 631 F.2d 741, 746 (D.C. Cir. 1979), citing only footnote 14 in Lonning. Then Anderson was relied on in FTC v. Invention Submission Corp., 965 F.2d 1086, 1089 (D.C. Cir. 1992),and Invention Submission was relied on in Resolution Trust Corp. v. Walde, 18 F.3d 943, 946-47 (D.C. Cir. 1994).

The "fact" proposition then entered our case law when we cited Walde (and its quote from Invention Submission) in In re McVane, 44 F.3d 1127, 1135 (2d Cir. 1993) ("[I]f the district court concludes that the information sought by the agency is relevant, we will affirm unless that determination is clearly erroneous."). More recently, we adhered to the "fact" proposition in NLRB v. American Medical Response, Inc., 438 F.3d 188, 193 (2d Cir. 2006), citing McVane.

Our adherence to the "fact" proposition in American Medical

-2-

<u>Response</u> is problematic.  We said:

> The district court defers to the agency's appraisal of relevancy, which must be accepted so long as it is not clearly wrong, and, in turn, we affirm a district court's finding of relevancy unless that determination is clearly erroneous.

<u>American Medical Response</u>, 438 F.3d at 193 (internal quotation marks and citation omitted).  Since the district court is obliged to use the lenient standard of deference to an agency's determination of relevance that is not clearly wrong, it would seem to be an error of law, to be reviewed <u>de novo</u>, for a district court to fail to abide by its obligation to apply that standard of deference.[1]

Two circuits have adhered to the "fact" proposition independent of the chain of authority that originated in the D.C. Circuit.  In both instances, the basis for such adherence is also problematic.  In <u>EEOC v. Packard Electric Division, General Motors Corp.</u>, 569 F.2d 315, 318 (5th Cir.  1978), the Fifth Circuit said, "Since the question of relevance in this instance is essentially a factual determination

---

[1]I have considered and rejected the possibility that the standard of appellate review of a district court's determination of relevance should be "clearly erroneous" review when the enforcement is granted and <u>de novo</u> when it is denied.  Standards of review generally do not vary depending on the outcome in a district court.  <u>But see</u> <u>In re Nassau County Strip Search Cases</u>, 461 F.3d 219, 225 (2d Cir. 2006) ("We are 'noticeably less deferential when the district court has denied class status than when it has certified a class.'") (quoting <u>Parker v. Time Warner Entertainment Co.</u>, 331 F.3d 13, 18 (2d Cir. 2003)).

concerning the interrelation or lack thereof of different groups of facts, we must uphold the district court's determination unless it is clearly erroneous." Id.  Presumably the "facts" the Court had in mind were the agency's authorized investigative purposes and the range of information sought.  "Relevance [in the enforcement of an EEOC subpoena] is determined in terms of the investigation rather than in terms of evidentiary relevance." Federal Express, 558 F.3d at 854. But determining the proper relationship between such facts involves application of a legal standard, not a finding of fact.

Interestingly, the D.C. Circuit, the originator of the "fact" proposition, has backed away from the notion that "clearly erroneous" is the standard for appellate review of a district court's relevance ruling.  In Director, Office of Thrift Supervision v. Vinson & Elkins, LLP, 124 F.3d 1304 (D.C. Cir. 1997), the Court stated, "If the dispute turns on the relevance of the information sought by a government agency, we have said that the district court should not reject the agency's position unless it is 'obviously wrong,' and that the burden, as a practical matter, is on the defendant to meet that test." Id. at 1307 (emphasis in original).  The D.C. Circuit then added this revealing footnote:

> We have said that a district court's determination of relevance is reviewable by us under the clearly erroneous test, FTC v. Anderson, 631 F.2d 741, 746 (D.C. Cir. 1979)

-4-

(quoting FTC v. Lonning, 539 F.2d 202, 210 n.14 (D.C. Cir. 1076). Applying a deferential standard on appellate review does not mean that the district court has authority to determine relevance in the first instance. To the contrary, we apply that standard in light of the great deference the district court owes the agency.

Id. at 1307 n.3.

Other circuits have shown no reluctance to reverse a district court that had considered an administrative subpoena beyond the scope of the agency's authority, and have done so without any hint that they regarded relevance as an issue of fact to be reviewed for clear error. See United States v. Newport News Shipbuilding & Drydock Co., 862 F.2d 464, 471 (4th Cir. 1988) ("The district court took too restrictive a view of [Defense Contract Audit Agency]'s access to defense contractor records."; United States v. O'Neill, 619 F.2d 222, 228 (3d Cir. 1980) ("It appears the trial court gave too little weight to the needs of the [United States Civil Rights] Commission.");[2] Adams v. FTC, 296 F.2d 861, 868 (8th Cir. 1961) ("[T]he documents called for are reasonably relevant.").

---

[2]A year later, the Third Circuit, affirming a district court order enforcing an administrative subpoena, stated that the district court's three findings that the information sought was relevant, not already within the agency's possession, and requested pursuant to agency procedure were not clearly erroneous. EEOC v. University of Pittsburgh, 643 F.3d 983 (3d Cir. 1981). Reliance was placed on Denicola v. G.C. Murphy Co. 562 F.2d 889, 892 (3d Cir. 1977), which had stated the unexceptional proposition that factual findings in Title VII cases are reviewed for clear error.

-5-

I recognize that the issue of relevance of information sought by an administrative subpoena might comprehend factual issues. Determining what information is sought and what investigative purposes an agency is pursuing might well be matters of fact. "A finding by the district court that documents are reasonably relevant to a legitimate agency purpose cannot be overturned absent a showing that the factual determinations on which it is based are clearly erroneous." EEOC v. United Airlines, 287 F.3d 643, 649 (7th Cir. 2002) (emphasis added). But once those factual matters are resolved (or are undisputed), the determination of whether the information sought bears a sufficient relationship to the investigative purposes to permit enforcement of the subpoena is predominantly a matter of law, requiring adherence to the standard of affording deference to the agency. The relevance requirement is to be "generously construed" and "is not especially constraining." EEOC v. Shell Oil Corp., 466 U.S. 54, 68 (1984). In rare cases, the relationship might be so attenuated that a district court, or an appellate court reviewing a district court's enforcement order, might properly rule that the broad scope accorded an agency has been exceeded. And when, as in this case, a district court fails to accord appropriate scope to an agency's legitimate demands for information, an appellate court is entitled to rule that the district court has committed an error of law.

I therefore join the Court's opinion, which reverses the District Court's denial of enforcement because that Court "applied too restrictive a standard of relevance." That conclusion properly regards relevance, in this context, as a matter of law.